UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL D. CHEVALIER,
     *Plaintiff*,                 CASE NO. 2:14-CV-10871-DML-PTM

*v*.

COMMISSIONER OF            DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,         MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the

Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS**

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that

Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. §

636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's

decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Security Income ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 20.)

Plaintiff Michael Chevalier was forty-one years old at the time of the administrative hearing on July 17, 2012. (Transcript, Doc. 33 at 13, 157, 164.) Plaintiff worked as an assembly line worker, a tree trimmer, and a photographer before his alleged disability onset. (Tr. at 218.) Plaintiff filed his claims for DIB and SSI on May 19, 2011, alleging that he became unable to work on January 30, 2000.[2] (Tr. at 157-63, 164-74.) The claims were denied at the initial administrative stage. (Tr. at 78-79.) In denying Plaintiff's claims, the Commissioner considered discogenic and degenerative disorders of the back and curvature of the spine. (*Id.*) On July 17, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Thomas McGovern, who considered the application for benefits de novo. (Tr. at 33-77.) In a decision dated August 30, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 13-31.)

On September 17, 2013, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied Plaintiff's request for review. (Tr. at 3-8.) On February 25, 2014, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.     Standard of Review**

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482

---

[2] The ALJ modified the alleged onset date to January 3, 2000. (Tr. at 19.)

U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered de novo by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.    The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides DIB to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI, 42 U.S.C. §§ 1381-1385, provides SSI to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> **Step One:** If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> **Step Two:** If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> **Step Three:** If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> **Step Four:** If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> **Step Five:** Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

4

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.    The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff met the insured status requirements through September 30, 2011, and had not engaged in substantial gainful activity since January 3, 2000, the alleged onset date. (Tr. at 19.) At Step Two, he found that Plaintiff's conditions of ankylosing spondylosis of the cervical spine, chronic neck pain, bilateral foot bunions, depression, and anxiety, were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (*Id.*) At Step Three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 19-20.) At Step Four, he found that Plaintiff could perform simple unskilled sedentary work with several limitations and was unable to perform any past relevant work. (Tr. at 20-26.) He also found that Plaintiff was twenty-eight years old on the alleged onset date, putting him into the "younger individual" range of eighteen to forty-four years old. (Tr. at 26.) At Step Five the ALJ found that, considering Plaintiff's age, education, work experience and RFC, there were jobs existing in

5

the economy in significant numbers that Plaintiff could perform, and therefore, found that Plaintiff was not disabled. (Tr. at 27-28.)

### E.      Administrative Record

### 1.      Medical History

#### a.      *Treatment of Physical Symptoms*

On February 24, 2010, Plaintiff saw Dr. Susan J. VanDellen for a rheumatological consultation for ankylosing spondylitis ("AS"). (Tr. at 254-60.) He had been diagnosed with the condition when he was sixteen years old. (*Id.*) He was taking Enbrel which was working "well" for him. (*Id.*) He had pain in his low back, mid back, neck, ribs, and into his legs. (*Id.*) He had intermittent sternum pain and denied swelling in the joints when he was diagnosed. (*Id.*) He also had a history of iritis and used steroid eye drops. (*Id.*) He had a lot of stiffness in the mornings. (*Id.*) He was a self-employed photographer and also worked on home renovations. (*Id.*) X-rays of the pelvis showed "there [was] almost complete fusion of the sacroiliac joints, hip joint spaces [were] intact, [and there was] no syndesmophytes in the lower lumbar spine; x-rays of the sacroiliac joints showed also showed fusion. (*Id.*) Plaintiff was counseled about his condition and was to continue on Enbrel shots once per week. (*Id.*)

On July 14, 2010, Plaintiff saw Dr. VanDellen for a "flare of neck pain, which cause[d] headaches." (*Id.*) He had been through physical therapy and it was not helping. (*Id.*) He had normal lateral range of motion and good extension, but decreased flexion in his neck. (*Id.*) Her relevant impressions were AS, neck pain, and headaches. (*Id.*) She offered a Medrol Dosepak, and physical therapy but Plaintiff declined. She recommended a stretching program for his axial spine, and also advised him to try water aerobics or yoga and to swim for exercise;

Plaintiff did not want to have any additional medication. (*Id.*) She thought he would be able to get Enbrel through his Medicaid; she prescribed one shot per week. (*Id.*)

Plaintiff was treated with Dr. Rafia Khalil at the Bone and Joint Institute from December 28, 2010 to May 17, 2011 and again from August 16, 2011 to May 8, 2012. (Tr. at 275-89, 347-53.) He reported, in relevant part, morning stiffness lasting between one to three hours, joint pain, excessive, dizziness, muscle spasms, worries, anxiety, and easily losing temper. (Tr. at 276.) He indicated that most of the time he functioned "well." (Tr. at 280.) Plaintiff transferred to Dr. Khalil to treat his AS, which had been diagnosed with about twenty years ago and the symptoms had been "fairly well controlled on Enbrel . . . ." (Tr. at 288.) Plaintiff reported "intermittent pain," primarily in his neck, and upper and mid back, but also in his chest, ribs, and legs, which he rated as a two to three.[3] (*Id.*) His pain was worsened by "bending, prolonged walking, standing, sleeping[,] and sometimes doing the dishes"; he usually had stiffness in the morning which lasted for one to three hours. (*Id.*) He denied having physical therapy or trying muscle relaxers. (*Id.*) Upon examination, Plaintiff had neck tenderness, when he stood against the wall he had to hyper extend his neck, he had thoracic kyphosis, "decreased range of motion of the lumbar spine in forward flexion," intact side movements and expansion of the chest, a positive Faber's test on the right, and no tenderness in the SI joint region. (*Id.*) He was referred to physical therapy for neck pain. (*Id.*)

On February 8, 2011, Plaintiff rated his pain as a four, and had not tried physical therapy. (Tr. at 286.) Dr. Khalil noted Plaintiff was "doing fairly well on Enbrel." (*Id.*) On May 17, 2011, Dr. Khalil noted Plaintiff's "[AS] seem[ed] to be fairly well controlled with Enbrel,"

---

[3] This seems to be on a scale from one to ten. Plaintiff completed a form on his May 8, 2012 visit where he was asked what level his pain was on a pain scale from one to ten. (Tr. at 349.) Also, in a different note from Dr. Khalil's office, Plaintiff complained of a "flare-up," where the pain was a nine to ten instead of the usual two to three. (Tr. at 352.)

but that he had been off of the Enbrel for two weeks "because of some insurance problems." (Tr. at 285.) Plaintiff rated his pain as a five [presumably out of ten]. (*Id.*) Dr. Khalil provided him with samples of Enbrel. (*Id.*) On August 16, Plaintiff's wife called to cancel his appointment because "they ha[d] no money to pay for the visit." (Tr. at 353.) On November 11, Plaintiff called complaining of a "flare-up," resulting in difficulty moving and severe pain, which he measured as a nine or ten instead of the usual two to three. (Tr. at 352.) Dr. Khalil prescribed a Medrol dose pak and Plaintiff was advised to come in the next week. (Tr. at 351.) Plaintiff's wife called in on November 16 to cancel his appointment for that morning because their daughter was in the hospital. (Tr. at 350.) Plaintiff had an appointment on May 8, 2012, where he reported that his symptoms were better with Enbrel. (Tr. at 349.) He rated his pain as a four out of ten. (*Id.*)

Plaintiff underwent a consultative examination with Dr. Richard C. Gause on October 19, 2011. (Tr. at 319-23.) Several years prior to this, Plaintiff had been without his Enbrel and "[h]is pain and discomfort intensified dramatically," however upon "resuming the Enbrel his symptom level diminished significantly. (*Id.*) Upon examination, Plaintiff had "very mild scoliosis of the neck," his grip strength was intact, his dexterity was unimpaired, he could pick up a coin, he could button clothing, and he could open a door. (*Id.*) Plaintiff walked with a normal gait without an assistive device. (*Id.*) Dr. Gause concluded, Plaintiff had scoliosis of the neck because of vertebral changes, his range of motion was impaired in the cervical and lumbar spines, and "[o]n Enbrel he [was] doing well with continued improvement in his symptomatology." (*Id.*)

Plaintiff saw Dr. Dawn Lambrecht for his bilateral foot pain on December 29, 2011 (Tr. at 338-346.) He reported his AS and she noted that he had been taking Enbrel for "a number of

years . . . [and] [o]verall he [was] doing fairly well." (Tr. at 345.) He reported chronic daily pain and recurrent bouts of iritis, which he experienced about five to six times in the last year"; it was being treated with prednisone and seemed to be resolving. (*Id.*) His only current complaint was a painful callous on the bottom of his right foot. (*Id.*) He did not report any problems with his AS flaring up in the past. He was to continue treating with Dr. Khalil and taking Enbrel for his AS. (*Id.*) He rated his pain as a three out of ten. (Tr. at 346.) He returned on January 9, 2012 for a follow up and again rated his pain as a three out of ten. (Tr. at 342.) He was managing his AS pain with Enbrel and medical marijuana and treating with Dr. Khalil. (*Id.*) On April 16, 2012, Plaintiff returned for another follow up for his foot pain and Dr. Lambrecht diagnosed bilateral foot bunions. (Tr. at 341.) There is no mention of Plaintiff's AS at this appointment.

Dr. Lambrecht completed an RFC questionnaire on July 3, 2012. (Tr. at 354-57.) For the frequency and length of contact question she indicated that she had seen Plaintiff three times, starting on December 29, 2011. (*Id.*) Her diagnosis was AS, iritis, irritable bowel syndrome, and anxiety. (*Id.*) She indicated that he treated with Enbrel weekly, which has "allowed some pain relief." (*Id.*) She said his symptoms would "frequently" interfere with his attention and concentration. (*Id.*) She said he would only be able to sit or stand for a total of "less than two hours" in an eight-hour working day. (*Id.*) She said he would need two to three ten to fifteen minute long unscheduled breaks an hour in an eight-hour working day. (*Id.*) His legs would need to be elevated forty-five degrees with prolonged sitting. (*Id.*) He needed a cane occasionally when engaging in standing or walking. (*Id.*) He could occasionally lift ten pounds, rarely lift twenty pounds, and never lift fifty pounds. (*Id.*) He could never look down or up and rarely look left or right or hold his head in a static position. (*Id.*)

### b.     Treatment of Mental Symptoms

Plaintiff was treated at Blue Water Counseling by Dr. Devin R. South from June 14, 2010 to May 16, 2011. (Tr. at 261-74.) He went to treatment approximately once a week to begin with, however his appointments tapered down to once or twice a month as he got closer to May, 2011. (*Id.*) He presented with anger issues and "frequent conflict within [his] marriage." (Tr. at 263.) He described himself as a man with a short fuse who was angry at the world. (*Id.*) His daily arguments with his wife quickly escalated to yelling and screaming. (*Id.*) He cycled between a high motivation to change "for his son," and being angry and blaming his wife for his problems. (*Id.*) He reported that his wife had an affair in the first months of their marriage and their family life had been difficult since. (*Id.*) Plaintiff was unemployed at the time, but reported an "attempt to establish a photography business . . . [and] [i]n the mean time . . . doing side jobs including landscaping, renovations, and painting." (*Id.*) Finances were also a constant source of stress, along with the stress of caring for his parents. (*Id.*) Plaintiff was diagnosed with depressive disorder and generalized anxiety disorder. (Tr. at 265.)

On July 9, 2010, Plaintiff reported, "Overall things have been better between he and his wife." (Tr. at 273.) On July 16, Plaintiff's wife called in and cancelled Plaintiff's appointment for that day. (Tr. at 272.) On September 10, Dr. South "reviewed diaphragmatic breathing as well as . . . doing daily tasks at a slower pace." (Tr. at 271.) Plaintiff had been improving but he regressed a little bit when his daughter was born with some health issues around December, 2010. (Tr. at 269-71.) He cancelled his February 4 and his wife cancelled his February 18, 2011 appointments. (Tr. at 269.) On February 25, 2011, Plaintiff reported his symptoms were "almost back to where [they] were" before the baby. (Tr. at 268.) He attributed the improvement to the medicine and "taking more time for prayer." (*Id.*) He still expressed

10

"difficulty with his wife's 'snapping' at him." (*Id.*) Plaintiff had a three-day lapse in his

prescription on March 4, 2011 and his symptoms returned; he was put back on Paxil. (Tr. at

263.) His Global Assessment of Functioning ("GAF") score at this time, when it appears he

was off the Paxil, was fifty-five.[4] (Tr. at 265.) On March 15 Plaintiff continued to improve—

he explored his triggers including the "role his wife's anger play[ed] in triggering [his] anger."

(Tr. at 266.) A couple's session was discussed to address his communication issues. (*Id.*) On

April 19, Plaintiff's wife called to cancel therapy—she stated they would be "losing insurance

at the beginning of May." (*Id.*) On April 26, Plaintiff and his wife went to a counseling session.

(Tr. at 267.) Plaintiff reported that his "insurance [would] be changing and that he [would]

likely be without insurance for several months." (*Id.*) Some basic communication strategies

were reviewed with Plaintiff and his wife. (*Id.*)

Plaintiff was discharged May 16, 2011 because of he was "[n]o longer covered under

current insurance." (Tr. at 261.) Plaintiff was going to look into options and contact them when

he was insured "if ongoing counseling was needed." (*Id.*) His primary care physician was to

continue his medications. (Tr. at 262.) Plaintiff was satisfied with the results of his treatment

and he had a GAF score of seventy[5] upon discharge. (*Id.*) It appears that Plaintiff tried to return

to Blue Water Counseling: The record has an admission date of April 25, 2012 and a discharge

date of April 27, 2012. (Tr. at 328-32.) It does not appear that he actually had any treatment at

this time because there is no discharge diagnosis. (*Id.*) The discharge notes indicated that he

---

[4] A GAF score of fifty-one to sixty indicates, "Moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) [hereinafter *DSM-IV*].

[5] A GAF score of sixty-one to seventy indicates, "Some mild symptoms (e.g, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV*, *supra* at 34.

was discharged because, according to his wife, he "refused to attend therapy sessions." (Tr. at 329.)

####    2.    Function Report

Plaintiff's typical day consisted of waking up after getting only about four to five hours of sleep, taking about two to three hours to "loosen up" and get motivated, and moving at his own pace to ensure he did not "over do it." (Tr. at 226.) He tried to help take care of his children as much as possible. (*Id.*) His wife did most of the working taking care of their children and dog. (*Id.*) He usually could take care of his personal care on his own except when his condition flared up. (*Id.*) His wife did the cooking and preparing meals because standing at a counter for too long would cause pain. (Tr. at 227.) He could do some cleaning but not for very long, he did some yardwork and gardening, and doing chores would take him about two to three times as long as a healthy person. (*Id.*) He spent time with others, specifically daily with his wife and children, and with his in-laws a few times a month. (Tr. at 229.) He said he had problems getting along with others because he often disagreed and argued. (Tr. at 230.) His condition caused problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, completing tasks, concentrating, and getting along with others. (*Id.*) He could pay attention for a few minutes, he could follow written instructions well but sometimes he would have to read things several times, and he could follow spoken instructions "fair to good." (*Id.*) He was once laid off because of difficulties with others and he was once fired after an argument with a boss. (Tr. at 231.) He had used a cane in the past when he had a lot of pain in his pelvis and legs. (*Id.*)

### 3.      Plaintiff's Testimony at Administrative Hearing

At the administrative hearing on July 17, 2012, Plaintiff testified as follows. (Tr. at 33-77.) He did not use any assistive device, such as a cane. (Tr. at 38.) He lived with his nineteen-month-old and three-year-old children and his wife. (*Id.*) When asked what the source of his family's income was, he testified that he was self-employed and that his wife was employed (Tr. at 39.) They were also receiving SSI for their daughter. (*Id.*) His work consisted of his photography business, which he ran out of his house. (Tr. at 40.) He advertised on the internet a little bit, but most of his business was through word-of-mouth. (Tr. at 41.) He would usually do portrait work, at a client's home or some other location; the average session would take about two hours. (*Id.*) He processed the pictures digitally. (Tr. at 42.) He was much busier in 2010 than 2011 because there were "more opportunities." (*Id.*) He sometimes met with clients but often things could be done online. (Tr. at 42-43.)

He had pain from his neck to his pelvis. (Tr. at 44.) The ALJ noticed that when Plaintiff turned, he turned his whole body; Plaintiff explained it was because of stiffness. (*Id.*) He would have pain if he moved his neck too far side-to-side, or if he did one activity, such as sit at a computer for too long. (*Id.*) At these times he would have to take a break and move around or go lay down. (Tr. at 44-45.) He said during a workday this might happen between four to six times. (Tr. at 45.) A lot of times when he would go to a photo shoot he would bring someone with him in case he needed a break and to help carry the equipment, such as lighting equipment, the tripod, and the camera.

Plaintiff gave himself an Enbrel injection once a week to treat his pain. (Tr. at 46.) He also took Paxil every day for anxiety and depression. (Tr. at 46-47.) He was under a lot of financial and family stress. (Tr. at 47.) His depressive episodes were caused by self-

consciousness and dwelling on things. (Tr. at 48.) He was not currently treating his depression, besides with the Paxil, but his previous year's therapy sessions helped. (Tr. at 49.) He could not remember the exact reason he had stopped going; he thought at first it was because his insurance would no longer cover the session and then when he tried to return the therapist he wanted was not available. (*Id.*)

On a typical day Plaintiff would wake up between 8:00 a.m. and 10:00 a.m. (Tr. at 52.) He would help around the house when he was able. (*Id.*) He would usually bathe at night without assistance. (*Id.*) He would do the dishes, but rarely all at once because bending over would aggravate his neck, resulting in pain. (*Id.*) He could mow the grass; he did not do laundry at all. (Tr. at 52-53.) He did not consider himself the principal care giver but he helped in the child care as much as he could. (Tr. at 53.) He cooked about half of the meals but they were usually simple meals. (Tr. at 54.) He sometimes used the computer during the day, he used Facebook, he had not done much with his website for a while, he did not watch television; he played board games, put together puzzles, and read to the children. (Tr. at 54-55.) They also had a lot of children's movies and television shows. (Tr. at 55.) He also shopped for the family—usually with the whole family. (*Id.*)

He would drive if he needed to meet a client or go to a doctor appointment. (Tr. at 56.) When asked if he visited family and friends or did social things, Plaintiff said he thought "our parents are probably the only people we visit." (*Id.*) He did not go out socially with his wife "very much." (Tr. at 57.) His wife worked outside of the home between two and four days a week. (Tr. at 57-58.) During these times, if his children were not with their grandmother, he would be the principle caregiver. (*Id.*)

Plaintiff's condition would sometimes cause "flare-ups." (Tr. at 58.) When this happened he would get "severe pain," usually in the mid to lower back, with "shooting pain down the center of [his] leg." (*Id.*) He estimated the flare-ups occurred five to six times a year and would last from two weeks to a month. (*Id.*) He would be in "agony" the entire duration of the flare-up and would be unable to do any photography work. (Tr. at 59.) During the flare-ups he would have problems meeting his personal needs—sometimes to the level of not being able to tie his own shoes. (Tr. at 60.) He would be unable to care for his children during those times so they would have to go to their grandmother's house. (*Id.*)

When he was not having a "flare-up" he could sit, stand, or walk approximately thirty minutes before needing to stop or change position. (Tr. at 64-65.) Sometimes changing positions would not be enough and he would have to lie down for about a half hour. (Tr. at 65.) Plaintiff also treated his pain with medical marijuana about three to four times a day. (*Id.*) He reported his flare ups to Dr. Khalil. (Tr. at 66.)

### 4. Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE"), Scott Silver, a series of hypothetical questions based on Plaintiff's age, education, and work experience. (Tr. at 67-77.) The first hypothetical individual could perform work at the light level, requiring the ability to sit and stand at will, and with the following additional limitations:

> This individual should not climb ropes, scaffolding, should not crawl, but could perform other postural activities occasionally. This individual should not work around unprotected heights or open hazards, and this individual would require simple, unskilled work activities.

(Tr. at 69. (sic throughout).) The VE said that the individual would not be able to perform any of Plaintiff's past work. (*Id.*) The individual would be able to do other work, for example, office helper (3400 jobs in Michigan and 88,000 nationally). (Tr. at 69-70.) The second

hypothetical individual was limited to unskilled sedentary work, with a sit/stand option and the other limitations. (Tr. at 70.) The second individual could do other work, for example, as an order clerk (4700 in Michigan and 210,000 nationally) and a surveillance monitor excluding Homeland Security and gaming institutions (2500 in Michigan and 91,000 nationally). (Tr. at 71.) The ALJ asked whether a person who "couldn't move their head or couldn't keep it in one position for more than 5 minutes at a time," could do the surveillance monitor work. (Tr. at 71.) He then clarified and asked if "an individual with limited range of motion of the neck in terms of flexion and rotation would not be able to perform" the surveillance monitor work. (Tr. at 71-72.) The individual with the limited range of motion in the neck would still be able to do the order clerk work. (*Id.*) The ALJ then asked if an additional limitation of taking "unscheduled rest breaks of 15 or 20 minutes at a time occasionally during the workday, would . . . impact the job." (Tr. at 72.) The VE said this would preclude employment. (*Id.*)

**F.      Governing Law and Analysis**

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545.

**1.      Legal Standard**

The ALJ determined that Plaintiff had the RFC

> to perform sedentary work . . . except the claimant can lift or carry up to 10 pounds maximally; the claimant can stand and/or walk (with normal breaks) for a total of 2 hours in an 8-hour workday; the claimant can sit (with normal breaks) for a total of 6 hours in an 8-hour workday; the claimant requires a sit/stand option at the workstation while remaining at the workstation (option means that the individual can sit/stand at will while

16

performing their assigned duties); never climb ladders, ropes or scaffolds or crawl; occasionally climb ramps or stairs; and can occasionally balance, stoop, crouch, and kneel; no work around unprotected heights, or open hazards; limited range of motion of the neck; and all work should be simple unskilled work.

(Tr. at 20-21.)

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a

17

party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999));

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are

conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's

decision merely because it disagrees or because "'there exists in the record substantial

evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v.*

*Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v.*

*Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at

475. "The substantial evidence standard presupposes that there is a "'zone of choice'" within

which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*,

35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.    The Credibility Assessment was Supported by Substantial Evidence

The regulations establish the following two step process for evaluating subjective

symptoms, including pain. SSR 96-7p, 1996 WL 374186, at *2; *see also* 20 C.F.R. § 404.1529.

First, the ALJ determines "whether there is an underlying medically determinable . . .

impairment," that is, "an impairment[] that can be shown by medically acceptable clinical and

laboratory diagnostic techniques, that could reasonably expected to produce the individual's . .

. symptoms." *Id.* If there is not, then the symptoms "cannot be found to affect the individual's

ability to do basic work activities." However, if the symptoms "could reasonably be expected

to produce the individual's symptoms," the ALJ moves on to the second step of the process. *Id.*

At the second step, the ALJ evaluates the "intensity, persistence, and limiting effects" of the

symptoms to determine how much they limit the claimant's "ability to do basic work activities." *Id.* Either a claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms are substantiated by objective medical evidence and the ALJ accepts them, or the ALJ makes a credibility assessment with respect to the claimant's statements to determine the symptom's actual intensity, persistence, and limiting effects. *Id.*; *see also Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

While a claimant's description of symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), an ALJ may not disregard a claimant's subjective complaints about the severity and persistence of symptoms simply because substantiating objective evidence is lacking. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of confirming objective evidence regarding the severity and persistence of symptoms forces an ALJ to consider these factors:

> (i) . . . [D]aily activities; (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms; (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms; (vi) Any other measures . . . used to relieve . . . pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great

19

weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The ALJ found that Plaintiff was "less than fully credible." (Tr. at 25.) He considered the allegations Plaintiff made about his limitations to be "significantly inconsistent with the record." (*Id.*) The ALJ first considered Plaintiff's activities of daily living. (*Id.*) Plaintiff was very active in his photography business and doing side jobs like landscaping, renovations, and painting, but "failed to testify at the hearing" about them. (*Id.*) He also noted the household chores "including cooking, childcare for a 3-year-old and a 19-month-old child." (*Id.*) The ALJ found that "the record indicates that the claimant stopped working due to a business-related layoff rather than because of the allegedly disabling impairments. Further, there is no evidence of a significant deterioration in the claimant's medical condition since the layoff." (*Id.*) He then reasoned that Plaintiff's "impairment(s) would not prevent the performance of that job, since it was being performed adequately at the time of the layoff despite a similar medical condition." (Tr. at 23.)

Plaintiff first argues that the ALJ erred in his credibility assessment by focusing on Plaintiff's ability to do household chores and ignoring the fact that he had to take a lot of breaks after doing the chores, that he was limited in the chores he could do, that he sometimes

needed help with his personal care, that his wife prepared the meals, and that he needed a cane when he had "a lot of pain in his pelvis and legs." (*Id.* at 16.) However, in his decision, the ALJ specifically noted, among other things, Plaintiff's assertion that during his flare ups his wife helped him into bed and he was unable to care for the children. (Tr. at 22.) He noted, "[Plaintiff] tries to care for his 3-year-old[,] [h]e may cook half the meals," and that he "helps around the house when he can." (*Id.*) It is telling that one of the examples Plaintiff uses of the ALJ allegedly ignoring evidence is that Plaintiff's wife prepared meals. Plaintiff's statements on this very issue are in conflict: At the hearing he testified that he cooked half the meals but they were usually simple. (Tr. at 54.) In his function report he testified that his wife cooked the meals. (Tr. at 227.) Plaintiff's argument is without merit. Just because the ALJ did not resolve the conflicts in the record in Plaintiff's favor does not mean that he ignored evidence.

Plaintiff argues that the ALJ's finding that "there [was] no evidence of significant deterioration in the claimant's medical condition," (Tr. at 25), was erroneous. (Doc. 18 at 12-14.) I suggest that substantial evidence supports the ALJ's finding here. Plaintiff consistently rated his pain as a three or four out of ten. (Tr. at 286, 288, 342, 346, 349.) Dr. Khalil and others including Plaintiff opined that his AS was well-controlled with Enbrel (Tr. at 254-60, 286, 288, 317-23, 345.) Plaintiff testified that he always reported his flare-ups to Dr. Khalil, however, despite his allegations that he experienced flare-ups five to six times a month, the record only shows one flare-up reported to Dr. Khalil. (Tr. at 58, 66, 352.)

With respect to Plaintiff's mental impairments, Plaintiff argues, "The ALJ holds against Plaintiff's credibility that he voluntarily refused to engage in any further counseling, opting instead for medication . . . ." (*Id.*) Plaintiff argues that the ALJ should have taken into consideration that Plaintiff withdrew from therapy because of a lack of insurance and also that

"failure to seek mental health treatment may be the result of mental illness rather than evidence that a mental impairment is not severe." (*Id.*)

An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7. Generally, a failure to seek medical treatment "may cast doubt on a claimant's assertions of disabling pain [or other symptoms]." *Strong v. Soc. Sec. Admin.*, 88 F. App'x. 841, 846 (6th Cir. 2004). However, when there is evidence "suggesting that a [c]laimant's mental condition somehow hindered him [or her] from seeking" medical treatment, the failure to seek treatment "'should not be a determinative factor.'" *Id.* (quoting *Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 797 (6th Cir. 1986)).

To begin with, the ALJ does not base his credibility assessment *solely* on gaps in Plaintiff's mental treatment history. The ALJ noted that Plaintiff has "responded well to his medication treatment regime," and that he "voluntarily refused to engage in any further counseling, opting for a psychotropic medication regimen alone to deal with his mental health issues." (Tr. at 26.) The ALJ also noted, "claimant's own doctor . . . scored the claimant's [GAF] at 70, indicating only mild symptoms," and Plaintiff himself had "acknowledged that counseling helped him." (Tr. at 21.) Secondly, while it does appear that Plaintiff ended his treatment at Blue Water Counseling in May 2011 because of a gap in his insurance coverage, the discharge notes from April, 2012 indicate only that he "refused to attend therapy sessions." (Tr. at 329.) For these reasons I suggest that substantial evidence supported the ALJ's credibility assessment.

   ***b.***    ***The Opinion Evidence Findings Were Supported by Substantial Evidence***

  The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-03p, 2006 WL 2329939, at *2. When "acceptable medical sources" issue these opinions, the regulations deem the statements to be "medical opinions." 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

  The ALJ must use a six-factor balancing test to determine the probative value of this medical opinion evidence, including any treating source opinions that have not been given controlling weight. 20 C.F.R. § 404.1527(c). The ALJ should use the same analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

  Further, an ALJ must give a treating physician's opinions regarding the nature and severity of a claimant's impairments controlling weight when it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to the Commissioner are not "medical opinions" so they do not receive this deference. 20 C.F.R. § 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints is the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based

23

solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067

(N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations

also require an ALJ to provide "good reasons" for the weight assigned to the treating source's

opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of

Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

Plaintiff contests the weight the ALJ gave to Dr. Lambrecht's July 2012 RFC

questionnaire. (*Id.* at 14-15.) The ALJ accorded this opinion little weight because "Dr.

Lambrecht ha[d] only examined the claimant on [three] occasions," was not even treating

Plaintiff for his AS but for his foot bunions, and her RFC questionnaire was inconsistent with

her treatment notes and inconsistent with the record. (Tr. at 24.) The ALJ found, "the claimant

lacks a longitudinal history of treatment with this doctor," unlike his treatment with Dr. Khalil.

(*Id.*) The ALJ also noted the discrepancies between Dr. Lambrecht's notes from February 6,

and July 3, 2012. The ALJ could have ended his analysis with the above finding, but instead he

speculated about the motives behind Dr. Lambrecht's July 2012 opinion.

> The possibility always exists that a doctor may express an opinion in an
> effort to assist a patient with whom he or she sympathizes for one reason or
> another. Another reality, which should be mentioned, is that patients can be
> quite insistent and demanding in seeking supportive notes or reports from
> their physicians, who might provide such a note in order to satisfy their
> patient's requests and avoid unnecessary doctor/patient tension. While it is
> difficult to confirm the presence of such motives, they are more likely in
> situations where the opinion in question departs substantially from the rest
> of the evidence of record, as in the current case.

(Tr. at 24.)

I suggest that substantial evidence supports the ALJ's finding with respect to Dr.

Lambrecht's July RFC opinion evidence. Dr. Lambrecht had only examined Plaintiff three

times. (Tr. at 338-46, 354-57.) For two of the three visits she indicated that Plaintiff's AS was

24

being treated by Dr. Khalil and was being controlled by Enbrel, and at one of the visits she did not even discuss Plaintiff's AS. (*Id.*) Finally, her July opinion was inconsistent with her December and January notes and with the record. On December 29, 2011, Dr. Lambrecht noted that Plaintiff had been taking Enbrel for "a number of years . . . [and] [o]verall he [was] doing fairly well, and that his only current complaint was a painful callous on the bottom of his right foot. (Tr. at 345.) Her notes for January 9, 2012 indicate that he was there for a follow up and again rated his pain as a three out of ten. (Tr. at 342.) Further, the record consistently shows Plaintiff's AS was well controlled with Enbrel. (Tr. at 254-60, 286, 288, 317-23, 345.)

Plaintiff also takes issue with the ALJ's speculation about Dr. Lambrecht's motivations. Defendant concedes too much and calls this speculation harmless error. (Doc. 20 at 19). It may have been unnecessary and inflammatory; however, I suggest that the ALJ did not commit error by engaging in this speculation because, as long as substantial evidence supports an ALJ's finding, it is not for this Court to fault any tangential commentary.

### c.   *The RFC was Supported by Substantial Evidence*

The claimant must provide evidence establishing the RFC: "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [a claimant] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

Plaintiff argues that the ALJ's Mental RFC is flawed because the "record reflects greater than mild difficulties in social functioning." (Doc. 18 at 11.) Plaintiff points to medical records confirming anger issues and marital discord, and to overall GAF scores indicating

moderate symptoms. (*Id.*) Plaintiff then recounts his statements regarding the severity of his

mental impairments: "Plaintiff stated he spent time with his family and went to church once

per week, otherwise he was not social and did not go out any more. Previously he was laid off

from a bike shop due to difficulties with others. . . . Treatment notes reflect[] anger issues." (*Id.*

at 11-12.) Plaintiff says that despite this testimony and even the ALJ's acknowledgment that

"Plaintiff testified to rarely socializing and only visiting family," the ALJ "erroneously opines

that . . . Plaintiff had only mild limitations in social functioning." (*Id.* at 12.) Plaintiff says the

ALJ premised this on the fact that Plaintiff spent time with his family. (*Id.*) Plaintiff cites

Listing 12.00(c)(2) for the proposition that impaired social functioning can be demonstrated

by, for example, "a history of altercations, evictions, firings, fear of strangers, avoidance of

interpersonal relationships, or social isolation." (*Id.* (citing 20 C.F.R. Part 404, Subpart P,

Appendix 1 § 12.00 (c)(2)).)

      I suggest that the ALJ's RFC is supported by substantial evidence. First of all, most of

Plaintiff's argument here is really an attack on the ALJ's credibility assessment. It is true that

impaired social functioning can be demonstrated by, for example, "a history of altercations,

evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social

isolation." *Id.* However, the ALJ must consider all the evidence, not just the evidence that

favors a disability decision. As discussed above, the ALJ found Plaintiff to be "less than

credible," with respect to his allegations about the severity of his mental impairments and

constructed his RFC based on the limitations that he found credible. (Tr. at 25.)

      To the extent that Plaintiff argues that the GAF score is so probative of disability that

any contrary finding was in error, any such argument is not persuasive. The Commissioner

"has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability

26

programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted). Therefore, any decision not to rely on the GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35). Further, there are only two GAF scores in the record. He had a GAF of fifty-five on March 4, 2011 when he admitted he had been off of his Paxil; the other score was seventy upon discharge. (Tr. at 262, 265.)

### d.   The Commissioner Met Her Burden at Step Five

At Step Five, the burden shifts to the Commissioner, who must prove that "other work exists in the national economy that plaintiff can perform." 20 C.F.R. §§ 404.1520, 416.920. "Substantial evidence may be produced through reliance on the testimony of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays [Plaintiff's] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). The hypothetical is valid if it includes all *credible* limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

Plaintiff contends that the ALJ's hypothetical question to the VE did not include the "limited range of motion of the neck" restriction, which he incorporated into his RFC assessment. (Doc. 18 at 19.) Plaintiff asserts that therefore, the Commissioner did not meet her burden at Step Five because the hypothetical did not accurately depict Plaintiff's limitations. (*Id.*) This argument is devoid of merit because immediately after the ALJ asked the VE if a "person who couldn't move their head or couldn't keep it in one position for more than 5 minutes at a time" could perform the surveillance monitor position, he clarified by asking if "an individual with limited range of motion of the neck in terms of flexion and rotation would not be able to perform" the surveillance monitor work. (Tr. at 72.) Plaintiff attempts to revitalize his argument in his Response by clarifying that the ALJ specified that the limitation was "in terms of flexion and rotation," in the hypothetical but that in the RFC it was just a "limited range of motion of the neck." (Doc. 22 at 6 (citing Tr. at 20-21, 70).) I suggest that because the hypothetical question posed to the VE was more specific than the limitation eventually included in the RFC, the Commissioner met her burden. The hypothetical question posed to the VE "accurately portrayed [Plaintiff's] individual physical" impairment even better than the adopted RFC. *See Varley*, 820 F.2d at 779.

Plaintiff next argues that the ALJ erroneously relied on the availability of the surveillance system monitory job, despite the VE's testimony that the position would not be available to an individual with limited range of motion of the neck. (Doc. 18 at 19.) Plaintiff is correct that the ALJ did in fact include a limited range of motion of the neck limitation in his RFC, (Tr. at 20-21), that the VE testified that the surveillance monitor job would not be available to an individual with that limitation, (Tr. at 72), and that at Step Five the ALJ

erroneously relied on the VE's testimony about 2500 surveillance monitor jobs being available in Michigan. (Tr. at 27.)

However, I suggest that this is harmless error because Defendant meets her burden at Step Five by relying on the VE's testimony of 4700 order clerk jobs available in Michigan.

> Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'

20 C.F.R. § 404.1566(b). The Sixth Circuit has not set a specific number for what constitutes a "significant number" of jobs. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). However, in *Born v. Secretary of Health & Human Services*, it found that 2500 jobs will meet the burden. 923 F.2d 1168, 1174 (6th Cir. 1990). Plaintiff also argues that the job of order clerk, according to the DOT, requires "the ability to deal with people and the description involves both dealing with the general public and with kitchen employees. (*Id.* at 19-20.) However, the ALJ did not include any limitation in the hypothetical or the RFC assessment about inability to work with the public or with coworkers. (Tr. at 20-21.) Therefore I suggest that this argument is without merit.

### G.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 30, 2015     /S PATRICIA T. MORRIS
            Patricia T. Morris
            United States Magistrate Judge